**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| AURORA L. MESSICK, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-0236-SEM |
| | ) | |
| BRANDON M. RATLIEF, | ) | |
| | ) | |
| Respondent. | ) | |

**ORDER FOR DISTRIBUTION**
**AND DISBURSEMENT OF NET PROCEEDS**

WHEREAS, on March 11, 2024, Aurora L. Messick (the "Petitioner") filed a petition seeking partition of real property located at 141 Rodric Terrace in Dover Delaware (the "Property"); the Petitioner co-owned the Property with Brandon M. Ratlief (the "Respondent");[1]

WHEREAS, the parties stipulated to a partition by sale but disagree about distribution of the approximately $7,500.00 in remaining sale proceeds;[2] the Petitioner seeks a 50/50 split, while the Respondent has made claims for offset or contribution which would entitle him to the entire pot;[3]

---

[1] Docket Item ("D.I.") 1.

[2] *See* D.I. 6–7, 11, 13.

[3] *See* D.I. 11, 13.

WHEREAS, the parties fully briefed their disputes and participated in an evidentiary hearing on January 6, 2026;[4] at the evidentiary hearing, both parties testified as did a third party, Daniel Hickman; I admitted into evidence the Respondent's Exhibits A–C and E–F and the Petitioner's Exhibits 1–3 and 6;[5]

WHEREAS, the following facts are undisputed:

A.      The parties purchased the Property jointly, as joint tenants with the right of survivorship, closing on March 18, 2021. They did so while in a committed relationship, with an eye toward future marriage.

B.      When the parties purchased the Property, they were living together with the Petitioner's brother, Mr. Hickman, as a roommate. Although Mr. Hickman was not a purchaser of the Property, the parties planned for Mr. Hickman to move with them and contribute to the household expenses. Specifically, everyone agreed that Mr. Hickman would contribute $650.00 a month. The parties valued this at about 1/3 of the household expenses, which included a mortgage payment of $1,542.05 each month plus utilities. The parties agreed, however, that if Mr. Hickman moved out, they would split the household expenses 50/50.

---

[4] *See* D.I. 11, 17–20.

[5] The gaps reflect some exhibits which were never introduced and others for which I sustained objections. This order is being issued before the final transcript is docketed to ensure the "just, speedy, and inexpensive determination" of this motion, as required under Court of Chancery Rule 1. The relevant testimony is highlighted herein but not summarized in detail.

C. The parties' personal relationship soured, and the Petitioner moved out of the Property in late 2022. Although no longer a resident in the Property, the Petitioner kept her key to the Property and was able to visit several times; the Respondent never changed the entry locks, although he secured his personal bedroom. The Petitioner contributed to the mortgage for the Property even after she moved out.

D. Mr. Hickman did not leave with his sister; he stayed in the Property until around August or September 2024. The Respondent requested a higher contribution from Mr. Hickman beginning sometime in 2023: $875 (an increase of $225 over the prior $650 contribution).

E. By sometime in 2023, the Petitioner stopped contributing to the mortgage. Around that same time, the Respondent allowed other individuals to stay in the house, including a paid tenant and significant other, who stayed without payment or contribution.

WHEREAS, the evidentiary hearing left several disputes of fact; I draw the lines on the parties' material disputes as follows:[6]

A. The parties dispute when the Petitioner stopped contributing to the mortgage. The Respondent testified that he did not receive any payments after

---

[6] The parties have several other disputes which are not material to the issues pending before me and will not be addressed herein.

January 2023. The Petitioner testified she paid through April 2023. The Petitioner's testimony was not only more credible overall, but was supported by the Respondent's Exhibit E. The Petitioner will be credited with contributing to the mortgage through April 2023.

B. The parties dispute whether the Respondent's calculations within Respondent's Demonstrative 1 fully reflect all rental income he received. The Respondent testified that he electronically paid the mortgage for the Property and was reimbursed for doing so by the Petitioner and Mr. Hickman, who gave him cash. He explained that he would deposit that cash into his bank account when received. That course of conduct was supported by text messages about cash exchanges that match up with deposits of cash in the Respondent's bank statements.[7] The Respondent's counsel, thus, prepared Respondent's Demonstrative 1 identifying selected cash deposits as contribution or rental payments. But, on cross-examination, the Respondent admitted that he also collected rent from a tenant, which was reflected in Zelle transfers on his bank statements, and which was not included in the Respondent's calculations. The Respondent's attempt to hide additional contributions undermined his credibility and leaves me unable to rely on his self-selected cash entries. In calculating his claim for contribution, I will include the

---

[7] *Compare* Resp't's Ex. E (text messages), *with* Resp't's Ex. C (bank statements).

undisclosed Zelle payments and all cash deposits as contributions or rental income offsetting that due from the Petitioner.

C.     The parties also disagree about whether the Petitioner was free to use and enjoy the Property after she moved out. The parties' communications, admitted as Respondent's Exhibit E, support a narrative that the Petitioner was visiting the Property at her leisure as recently as April 2023. At some point in time thereafter, the Respondent communicated that he did not want the Petitioner in the Property unsupervised and the police later supervised the Petitioner while she retrieved some belongings.

WHEREAS, the parties have stipulated that the default split of the sale proceeds is 50/50; the Respondent, as the party seeking offsets for contribution is required to prove he is entitled thereto by a preponderance of the evidence;[8]

WHEREAS, Delaware law is clear that co-owners, absent prior agreement or ouster, are required to contribute equally to the mortgage and property taxes;[9] the

---

[8] *Green v. Shockley*, 2022 WL 275975, at *7 (Del. Ch. Jan. 31, 2022); *IMO 31-33 & 55-57 Thompson Circle, Newark, DE, 19711*, 2025 WL 1634709, at *7 (Del. Ch. June 10, 2025); *see also Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002) ("Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not.").

[9] *Haygood v. Parker*, 2013 WL 1805602, at *3 (Del. Ch. Apr. 30, 2013).

same is true for rental income—absent agreement otherwise, that income is meant to be split amongst the co-owners;[10]

WHEREAS, under Delaware law, "[a] cotenant is generally entitled to make personal use of property held in common and is not accountable for such use in the absence of ouster[;]"[11] "[h]owever, if a co-tenant has exclusive possession of the property and ousts other co-tenants, then the rental value (representing the benefit received by the co-tenant having exclusive possession) may be set off against their share of the sale proceeds[;]"[12] per Black's Law Dictionary, ouster is "[t]he wrongful dispossession or exclusion of someone (esp. a cotenant) from property (esp. real property);"[13] ouster requires more than sole possession; for the Petitioner to be ousted, the Respondent needed to denounce the Petitioner's ownership rights, purport to be the sole owner of the Property, or otherwise deny the Petitioner access to the Property;[14]

IT IS HEREBY ORDERED this 7th day of January 2026, as follows:

---

[10] *See Green*, 2022 WL 275975, at *6 (explaining that each co-tenant was entitled to "one half of the total [rental] revenue").

[11] *In re Est. of Gedling*, 2000 WL 567879 at *7 (Del. Ch. Feb. 29, 2000) (citations and quotation marks omitted).

[12] *Ponder v. Willey*, 2020 WL 6735715 at *3 (Del. Ch. Nov. 17, 2020).

[13] *Ouster*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[14] *IMO of the Real Property: Tax Parcel No. 26-012.20-080 generally known as 2300 W. Seventeenth St., Wilmington DE 19807*, 2021 WL 4999114, at *2 (Del. Ch. Oct. 20, 2021).

1.     The sale proceeds should be disbursed to the Respondent. The Respondent met his burden to prove that the Petitioner's share of the sale proceeds should be offset in full. In so holding, I reject the Petitioner's implicit ouster claim, memorialize and enforce the parties' agreements and course of conduct on shared expenses, and quantify the Petitioner's outstanding contribution and offsets, departing from the calculations proffered by the Respondent.

2.     **Ouster.** In testimony and closing remarks, the Petitioner and her counsel emphasized her concerns about remaining in the Property and returning after her departure. The concerns implicate the concept of ouster. If proven, ouster could require greater contribution by the Respondent, offsetting his claims. The evidentiary record does not, however, support a finding of ouster. The parties went through a difficult break up; the Petitioner felt compelled to leave the Property, but she continued to have access thereto. The closest the Petitioner comes to showing ouster is the Respondent's text in November 2023 that he did not want her in the Property "unsupervised."[15] That is not enough to show ouster, particularly when considered in the context of the entire evidentiary record. Absent ouster, the Respondent was generally entitled to make personal use of property.

3.     **The Parties' Agreements.** The parties agreed to a few important things when purchasing the Property. First, they agreed that Mr. Hickman, for as long as

---

[15] Resp't's Ex. E.

he lived in the Property, would contribute $650, as his approximate 1/3 share of the household expenses. Second, the parties agreed that the remaining household expenses would be split amongst the two of them. That amount was not fixed like Mr. Hickman's and would fluctuate both in the monthly bill amounts and the parties' respective contributions. While in a relationship, the parties were lenient and generous with their contributions and made things work in an informal manner. Their course of conduct supports that their 2/3 share was not paid through a strictly enforced 50/50 split. Third, the parties agreed that when Mr. Hickman left the Property, they would split the household expenses in that same roughly, but informal, 50/50 manner. The parties did not plan for what would happen if their relationship ended.

4.    **Quantifying the Offset.** Absent an agreement from the parties, I am called upon to quantify any offset or contribution that would change the standard 50/50 division of the sale proceeds. In doing so, I must determine the timeline and allocable expenses; then, I conduct some quick math.

a.    **The Timeline.** The Respondent asks me to go back to the start of the joint ownership (2021). That is not, however, an appropriate starting point. As I noted, the parties were in an intimate relationship and managed their finances in an informal manner, making ends meet on the household expenses. They did so consensually, reflecting a clear course of dealing, which would be inappropriate to

upend now.[16] Thus, any contribution that may be owed from the Petitioner and to the Respondent would have to post-date their relationship, which ended near the end of 2022. Further, as addressed above, the Petitioner will be credited with contributing to the mortgage through April 2023. Thus, May 2023 is the starting point and, reflected on Respondent's Demonstrative 1, the Respondent chose August 2024 as the ending point.

        b.    **The Allocable Expenses.** During the relevant timeline, the Petitioner was no longer living at the Property, and the Respondent had raised Mr. Hickman's monthly contribution to $875. As the out-of-possession co-tenant, the Petitioner was "not required to contribute to the living expenses for the in-possession cotenant."[17] Thus, the only expense I include in my calculation is the mortgage at $1,542.05 monthly.[18]

---

[16] *See Tex. Pac. Land Corp. v. Horizon Kinetics LLC*, 306 A.3d 530, 567 (Del. Ch. 2023) ("[A]ny course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.") (quoting Restatement (Second) of Contracts § 202 (1981)).

[17] *Thompson Circle*, 2025 WL 1634709, at *8 (citing *In re Turulski*, 1993 WL 18767, at *5 (Del. Ch. Jan. 21, 1993) (explaining maintenance and utility payments by a cotenant in possession are expenses incurred for the benefit of the cotenant "who would have had to pay them in any event")).

[18] In doing so, I am also excluding the Respondent's claims about the household appliances; because the mortgage contribution is sufficient to offset the Petitioner's share in full, I need not reach that alternative argument.

c.  **The Math.** As explained above, I have included all cash deposits and Zelle transfers from the undisclosed tenant as rent received. The amount of rent received offsets the contribution required from the Petitioner as reflected in the following chart:

| Month | Mortgage Payment | Rent Received | Petitioner's Unpaid Share |
|---|---|---|---|
| May-23 | $1,542.05 | $650.00[19] | $386.00 |
| Jun-23 | $1,542.05 | $650.00 | $386.00 |
| Jul-23 | $1,542.05 | $650.00 | $386.00 |
| Aug-23 | $1,542.05 | $650.00 | $386.00 |
| Sep-23 | $1,542.05 | $650.00 | $386.00 |
| Oct-23 | $1,542.05 | $650.00 | $386.00 |
| Nov-23 | $1,542.05 | $650.00 | $386.00 |
| Dec-23 | $1,542.05 | $650.00 | $386.00 |
| Jan-24 | $1,542.05 | $1,682.00[20] | $-69.97 |

[19] Because the Respondent, as the party with the burden of proof, failed to provide bank statements for May through December 2023, I infer in favor of the Petitioner that Mr. Hickman paid the agreed increased contribution of $875 each month, reflecting about half of the mortgage. That left the Petitioner responsible for 1/4 or $386.

[20] This includes a cash deposit of $300 on January 11, $300 from the undisclosed tenant on January 12, a cash deposit of $300 on January 16, $350 from the undisclosed tenant on January 26, and an additional cash deposit of $432 on January 26. Resp't's Ex. C.

| Month | Mortgage Payment | Rent Received | Petitioner's Unpaid Share |
|---|---|---|---|
| Feb-24 | $1,542.05 | $1,324.00[21] | $109.02 |
| Mar-24 | $1,542.05 | $1,465.00[22] | $38.52 |
| Apr-24 | $1,542.05 | $1,040.00[23] | $251.02 |
| May-24 | $1,542.05 | $1,100.00[24] | $221.02 |
| Jun-24 | $1,542.05 | $560.00[25] | $491.02 |
| Jul-24 | $1,542.05 | $710.00[26] | $416.02 |
| Aug-24 | $1,542.05 | $0 | $771.02 |
| | | **TOTAL:** | $5,315.67 |

5.    Because the Petitioner's unpaid contribution to the mortgage ($5,315.67) exceeds her share of the sale proceeds (around $3,750), she is not

---

[21] This includes $250 from the undisclosed tenant on both February 2 and February 9 and a cash deposit of $824 on February 12. *Id.*

[22] This includes a cash deposit of $565 on March 11, $300 from the undisclosed tenant on March 15, a cash deposit of $500 on March 15, and $100 from the undisclosed tenant on March 29. *Id.*

[23] This includes a cash deposit of $260 on April 15, a cash deposit of $420 on April 15, and a cash deposit of $360 on April 22. *Id.*

[24] This includes $250 from the undisclosed tenant on May 3, $250 from the undisclosed tenant on May 17, and a cash deposit of $600 on May 20. *Id.*

[25] This includes cash deposits of $160 on June 17 and $400 on June 25. *Id.*

[26] This was one cash deposit on July 22. *Id.*

entitled to any distribution. The escrow agent should distribute the sale proceeds to the Respondent.

6.      This is my final report under Court of Chancery Rule 144; any notice of exceptions is due within 11 days. Absent timely exceptions, the parties should prepare a form of implementing order directing disbursement.

IT IS SO ORDERED

/s/ Selena E. Molina
Senior Magistrate in Chancery